## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

UNITED STATES OF AMERICA

vs.                                    Case Nos.:  5:14-cr-25-TKW/MJF
                                                   5:19-cv-32-TKW/MJF

CHARLES HEATH STEWART

---

## REPORT AND RECOMMENDATION

Defendant Charles Heath Stewart ("Stewart") has filed a second amended "Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody." Doc. 194. The government filed a response, and Stewart filed a reply. Docs. 198, 207. For the reasons set forth below, the undersigned respectfully recommends that the section 2255 motion be denied without an evidentiary hearing.[1] *See* Rules 8(a)-(b), Rules Governing Section 2255 Cases.

## I—PROCEDURAL BACKGROUND

On September 17, 2014, a federal grand jury charged Stewart in a four-count indictment. Doc. 1. Counts One through Three charged Stewart with using, persuading, or inducing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, in violation of 18 U.S.C.

---

[1] The District Court referred this case to the undersigned to address preliminary matters and to make recommendations regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b).

§ 2251(a) and (e). Count Four charged Stewart with possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), (b)(2). The charges stemmed from law enforcement's discovery of "thumbnail" images on Stewart's personal cellular telephone ("cell phone"), which depicted Stewart's minor stepdaughter, C.T., performing a sexual act on Stewart. Doc. 30, PSR ¶¶ 10-11.

## A. <u>Relevant Pretrial Motions and Objections</u>

Certain pretrial motions and objections are relevant to Stewart's allegations in the instant motion. First, the government filed a motion *in limine* to exclude evidence regarding C.T.'s sexual behavior before and after the events charged in this case. The government argued that Stewart did not comply with Federal Rule of Evidence 412(c)(1)'s notice requirement. Doc. 52. In response, Stewart maintained that certain questions regarding C.T.'s alleged exposure to pornographic pictures and her own transmission and receipt thereof was relevant and did not fall under Rule 412. Doc. 54 at 1-2. United States District Court Judge Mark E. Walker denied the government's motion *in limine* and directed Stewart to file the required notice of intent to use evidence under Rule 412(c)(1). Doc. 60. Stewart complied. Docs. 54, 61. Judge Walker also ruled that Stewart could ask C.T. whether she had performed sexual acts with her boyfriend and, thus, whether the photographs at issue showed C.T. performing sexual acts on her boyfriend rather than Stewart. Doc. 103 at 56-57.

Second, Stewart filed a motion *in limine* to allow him to question his ex-wife and C.T.'s mother, Judy Stewart.[2] Doc. 56. Judge Walker granted the motion, holding that Stewart could question Ms. Stewart about her relationship with Stewart because it could be relevant to C.T.'s motive for accusing Stewart of sexually abusing her. Doc. 102 at 36-37.

Third, at a pretrial hearing, Stewart objected to the government introducing photographs from Stewart's cell phone that appeared to have been taken through a "peephole" into the bathroom of Stewart's home. *Id.* at 39-47. Judge Walker ruled that the photographs would not be excluded because they were relevant and their prejudice to Stewart did not substantially outweigh their probative value. *Id.* at 47.

Fourth, at the same pretrial hearing, Stewart objected to the government playing an audio recording of C.T.'s reaction to seeing for the first time the thumbnail images at issue in this case. *Id.* at 67. Judge Walker ruled that C.T.'s subsequent identification of herself and Stewart in the thumbnails was admissible because it was nonhearsay, as was C.T.'s statement, "I didn't think anybody would believe me," because it was an excited utterance. *Id.* at 72-73.

Finally, on the second day of Stewart's first jury trial, Judge Walker determined that the government could introduce four photographs of adult

---

[2] Judy Stewart assumed her maiden surname, "Collins," after she divorced Stewart. Thus, in the record, she sometimes is referred to as "Judy Collins."

pornography retrieved from Stewart's cell phone to rebut the defense that the phone was not Stewart's cell phone. Doc. 105 at 20-22.

## B.   Stewart's First Jury Trial

Stewart's first jury trial, which commenced on June 24, 2015, ended in a mistrial after defense counsel discovered that the government failed to disclose to Stewart text messages that had been deleted from Stewart's phone. *Id.* at 115-33. Two separate agencies, the Florida Department of Law Enforcement ("FDLE") and Homeland Security Investigations ("HSI") had separately downloaded data from Stewart's phone. The FDLE download, which was provided to defense counsel, was a "logical extraction," meaning it did not include text messages that had been deleted from the phone. The HSI download, on the other hand, was a "physical extraction" that retrieved, and thus included, the deleted messages. Because the physical extraction was not provided to the defense, the government conceded prejudice.

## C.   Pretrial Motions and Stewart's Second Jury Trial

### 1.   *Pretrial Motions*

Two pretrial motions filed before Stewart's second trial are relevant here. First, in light of information disclosed at Stewart's first trial, Stewart moved to suppress from his second trial the cell-phone searches and all of the data found

therein.[3] Docs. 92, 97. After a lengthy hearing, Judge Walker denied Stewart's motion for three reasons: (1) there was no evidence of intentional wrongdoing in law enforcement's handling of the phone; (2) neither chain-of-custody issues nor authenticity issues justified the suppression of the phone; and (3) any potential chain-of-custody issue was relevant to the weight rather than the admissibility of the evidence. Doc. 110; Doc. 164 at 160-66.

Second, the government moved to introduce Rule 404(b) evidence. Specifically, the government moved to introduce: (1) images of what appeared to be minors either engaged in sexually explicit conduct or displayed in a sexually provocative manner that were recovered from Stewart's phone; (2) sexually-explicit images of Stewart and his ex-wife taken from the same angle as child pornographic images also recovered from his phone; and (3) testimonial evidence of Stewart's alleged mental and physical abuse of his ex-wife, C.T., and his daughter, H.S. Docs. 77, 96, 101. Judge Walker ruled that the government could introduce a sampling of fifteen photographs of what appeared to be minors, some of whom were in provocative poses, and information about why C.T. was afraid of Stewart. Doc. 165-2 at 46-64. The defense withdrew the objection to the photographs of Stewart and his ex-wife engaged in sexual activity. *Id.* at 56.

---

[3] Judge Walker granted Stewart's request for an expert to conduct a forensic analysis of the electronic evidence. Docs. 82, 86.

### 2. *Stewart's Second Jury Trial*

On August 17, 2015, a new jury was selected, and after a four-day trial at which both Stewart and C.T. testified, the jury found Stewart guilty on all counts. Docs. 118, 125, 165.

The final Presentence Investigation Report ("PSR") grouped the four counts of conviction for guidelines calculations purposes. Doc. 130, PSR ¶ 34. Stewart's base offense level was 32. He received a two-level adjustment because the victim was under the age of 16; a four-level adjustment because the offense involved the commission of a sexual act; and a two-level adjustment because the minor victim was in his custody, care, or supervisory control. *Id.* ¶¶ 37-39. Thus, his total offense level was 40. *Id.* ¶ 46. Stewart's criminal-history category was IV due to prior convictions for burglary and domestic violence. *Id.* ¶¶ 56-62.

On December 7, 2015, Judge Walker sentenced Stewart to 720 months of imprisonment and a lifetime term of supervised release. Docs. 133, 134, 156. The sentence of imprisonment consisted of concurrent 360-month terms on Counts One and Two, followed by a consecutive 360-month term on Count Three. Count Four, possession of child pornography, was dismissed on the government's motion. Doc. 132.

D.    **Stewart's Appeal**

On appeal, Stewart's appointed counsel, Ryan Thomas Truskoski, raised two issues. Docs. 173, 198-1. First, he challenged Judge Walker's decision to admit into evidence the sampling of fifteen photographs discovered on Stewart's cell phone, which depicted provocatively-posed girls who appeared to be under the age of 18 years. Second, Truskoski challenged the procedural and substantive reasonableness of Stewart's sentence. On August 22, 2017, the Eleventh Circuit affirmed Stewart's conviction and sentence. *United States v. Stewart*, 704 F. App'x 855 (11th Cir. 2017). On January 8, 2018, the Supreme Court denied Stewart's petition for a writ of certiorari. Doc. 179.

E.    **Stewart's Section 2255 Motion**

On January 7, 2019, Stewart timely filed his original motion to vacate. Doc. 182 at 58. Stewart's second amended section 2255 motion, docketed on June 3, 2019, is now before the District Court, along with the government's response, and Stewart's reply. Docs. 194, 198, 207.

In the section 2255 motion, Stewart asserts that: (1) appellate counsel was constitutionally ineffective; (2) trial counsel was constitutionally ineffective; (3) his sentence was illegal; (4) the government suppressed and withheld material evidence and knowingly used perjured testimony; and (5) newly discovered evidence supports his claim of innocence.

## II—STATEMENT OF FACTS

On April 7, 2014, 15-year-old C.T. reported to Jackson County, Florida, Sheriff's Office ("JCSO") deputies that Stewart, her then-stepfather, forced her to perform oral sex on him. Doc. 130, PSR ¶ 11. But during another interview on April 9, 2014, conducted by a Child Protection Team ("CPT") from the State of Florida Department of Children and Families ("DCF"), C.T. denied she had ever been touched inappropriately. *Id.* ¶¶ 14-15.

On May 7, 2014, a DCF investigator contacted the JCSO and advised that C.T. wanted to speak to the police again. On May 8, 2014, C.T. told the police that Stewart had a drinking problem and that he would ask or force her to perform oral sex on him. *Id.* ¶ 17. He also fondled her breasts when her mother and younger sister were not at home. C.T. stated that Stewart had recorded videos of her performing oral sex on him. *Id.* ¶ 18. Other than fondling C.T.'s breasts, Stewart did not touch her or perform sexual acts on her.

On May 14, 2014, the JCSO obtained a search warrant for Stewart's cell phone. Doc. 130, PSR ¶ 22. On Stewart's cell phone, deputies found evidence confirming C.T.'s account. *Id.* ¶ 24. C.T. identified herself and Stewart in three sexually-explicit images, leading to the charges in Counts One, Two, and Three of the indictment. Stewart's cell phone also contained (1) photographs taken through a peephole or over or under the door of C.T.'s bathroom; (2) photographs of

unidentified minors, some in provocative poses; and (3) a significant amount of adult pornography, including pictures of Stewart and his then-wife Judy Stewart.

### III—STANDARD

"Section 2255 does not provide a remedy for every alleged error in conviction and sentencing." *Spencer v. United States*, 773 F.3d 1132, 1138 (11th Cir. 2014). Relief under section 2255 is instead "reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted).

A district court need not reconsider issues raised in a section 2255 motion that already were resolved on direct appeal. *Rozier v. United States*, 701 F.3d 681, 684 (11th Cir. 2012); *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000). That is, once a matter has been decided adversely to a defendant on direct appeal, it cannot be relitigated in a collateral attack under section 2255. *Nyhuis*, 211 F.3d at 1343 (citation omitted). Broad discretion is afforded to a court's determination of whether a particular claim previously was raised. *Sanders v. United States*, 373 U.S. 1, 16 (1963).

Furthermore, because a section 2255 motion is not a substitute for direct appeal, issues that could have been raised on direct appeal generally are not actionable in a section 2255 motion and are procedurally defaulted. *Bousley v.*

*United States*, 523 U.S. 614, 621 (1998); *Granda v. United States*, 990 F.3d 1272, 1286 (11th Cir. 2021) (citation omitted); *Lynn*, 365 F.3d at 1234-35. An issue is "'available' on direct appeal when its merits can be reviewed without further factual development." *Lynn*, 365 F.3d at 1232 n.14 (quoting *Mills v. United States*, 36 F.3d 1052, 1055 (11th Cir. 1994)). Absent a showing that the ground of error was unavailable on direct appeal, a court may not consider the ground in a section 2255 motion unless the defendant establishes either (1) cause for not raising the ground on direct appeal *and* actual prejudice resulting from the alleged error, or alternatively, (2) he is "actually innocent." *Bousley*, 523 U.S. at 622 (citations omitted); *Granda*, 990 F.3d at 1286; *Lynn*, 365 F.3d at 1234.

To show cause sufficient to excuse a procedural default, a defendant must show that "some objective factor external to the defense prevented [him] or his counsel from raising his claims on direct appeal and that this factor cannot be fairly attributable to [defendant's] own conduct." *Lynn*, 365 F.3d at 1235. For example, a meritorious claim of ineffective assistance of counsel can constitute cause. *See Nyhuis*, 211 F.3d at 1344. But actual prejudice is more than the mere possibility of prejudice. In a trial, for example, actual prejudice "requires that the error worked to the petitioner's actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Granda*, 990 F.3d at 1288 (citation omitted).

## IV—ANALYSIS

**A.    <u>Ground Two—Ineffective Assistance of Trial Counsel ("IAC")</u>**[4]

As noted above, this case was tried twice and there were numerous contested pretrial motions and objections. Although trial counsel challenged the government's case by casting doubt on C.T.'s identification of Stewart, the veracity of the allegations in general, and law enforcement's handling of the evidence, Stewart asserts that counsel was ineffective during her representation of him for six reasons.

To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) his attorney's representation fell below "an objective standard of reasonableness," and (2) a reasonable probability exists that, but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). That is, the defendant must "prove, by a preponderance of the competent evidence, both that counsel's performance was unreasonable, and that [ ]he was prejudiced by that performance." *Demar v. United States*, 228 F. App'x 940, 950 (11th Cir. 2007) (quotation marks, brackets, and citations omitted).

---

[4] Ground one of Stewart's second amended section 2255 motion is a claim of ineffective assistance of appellate counsel. Doc. 194 at 4. Stewart's IAC claim is ground two. *Id.* at 5. Because the events at Stewart's trial occurred before the events at Stewart's appeal, the undersigned first will address Stewart's claim that his trial counsel was ineffective.

To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel" would have taken the action that his counsel took. *Gordon v. United States*, 518 F.3d 1291, 1301 (11th Cir. 2008) (citations omitted); *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000). A court must review counsel's conduct in light of all the circumstances and without the distorting effects of hindsight. *Strickland*, 466 U.S. at 688-89; *see also Dingle v. Sec'y for Dep't of Corr.*, 480 F.3d 1092, 1099 (11th Cir. 2007). This review is highly deferential to counsel: the court "must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Hammond v. Hall*, 586 F.3d 1289, 1324 (11th Cir. 2009) (quoting *Strickland*, 466 U.S. at 689); *see Chandler*, 218 F.3d at 1315-16 (discussing presumption of reasonableness of counsel's conduct).

To show prejudice, a defendant must establish that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. But the reviewing court must not focus on outcome determination alone. "To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." *Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993); *Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 754 (11th Cir. 2010). Thus, "[t]he

likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (quoting *Strickland*, 466 U.S. at 693).

### 1.    *Failure to Investigate and Interview Witnesses*

The primary thrust of Stewart's first IAC claim is that he was prejudiced by trial counsel's handling of witnesses. He claims that his trial counsel failed to call on the witnesses with the "best testimony," she failed to interview witnesses, and she did not contact certain individuals Stewart believes could have had relevant information. Doc. 194 at 5, 36-42.

Stewart's burden of showing prejudice for counsel's failure to call a witness is a heavy one. *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006) (quoting *United States v. Guerra*, 628 F.2d 410, 413 (5th Cir. 1980)). Ineffective assistance claims based on "'complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because all allegations of what a witness would have testified are largely speculative.'" *Chaney v. Sec'y, Fla. Dep't of Corr.*, 447 F. App'x 68, 70 (11th Cir. 2011) (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)); *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). Furthermore, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision" that seldom, if ever, serves as grounds to find counsel's assistance ineffective. *Conklin v. Schofield*, 366 F.3d 1191, 1204 (11th Cir. 2004); *United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004);

*United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) ("[C]ounsel's decision as to 'whether to call specific witnesses—even ones that might offer exculpatory evidence—is ordinarily not viewed as a lapse in professional representation.'") (citation omitted).

To prevail on such a claim, a defendant must show that the relevant witness would have offered testimony sufficient to create doubt about his conviction. *Fortenberry v. Haley*, 297 F.3d 1213, 1227-28 (11th Cir. 2002); *Jordan v. McDonough*, No. 6:06-cv-1446-ORL-19KRS, 2008 WL 89848, at *5 (M.D. Fla. Jan. 7, 2008) (noting that failing to call a particular witness constitutes ineffective assistance of counsel "only when the absence of the witness's testimony amounts to the abandonment of a viable, outcome-changing defense"). Furthermore, a defendant's own conclusory testimony about what the witnesses would have said and whether they would have been available and willing to testify alone is "simply inadequate to undermine confidence in the outcome" of the proceeding. *McKiver v. Sec'y, Fla. Dep't of Corr.*, 991 F.3d 1357, 1365-66 (11th Cir. 2021) (collecting cases); *Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir. 2010). Speculation alone is insufficient to carry the defendant's burden. *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001).

Stewart offers three arguments in support of his assertion that Downing was constitutionally ineffective in her handling of witnesses or potential witnesses at

Stewart's trial. First, Stewart claims that the ten witnesses from his witness list that testified at his trial were a "parade of ineffectual witnesses" because many of them had little to no meaningful testimony due to their minimal contact with C.T.[5]  Doc. 194 at 38. Stewart specifically identifies Rhonda Connelly, Mike Hutchins, Bradley Langford, and Jane Collins. *Id.* He states that if Downing had spoken to these witnesses in advance, she would have known that they would not be beneficial.

Second, Stewart contends that Downing should have spoken to Jeffery Tartar, Anissa Cottongim, and Ange Griffin from DCF[6]; Tea Open (C.T.'s best friend); and Doug Martin, a man whom Stewart claims had an unnatural "preoccupation" with C.T. *Id.* at 37. Stewart also claims that he told Downing to call as witnesses (1) his ex-wife Judy's father, Laughton B. Collins; (2) Laughton's wife, Carylon Collins; (3) Judy's brother, Clyde Collins; and (4) Tea Open. *Id.* at 39. Stewart suggests that

---

[5] Stewart's witness list, which was not amended at his second trial, listed 23 individuals. Doc. 49. The government had seventeen witnesses on its final list. Doc. 109.

[6] Stewart asserts that an investigation of Cottongim and DCF reports would have revealed who reported C.T.'s alleged abuse to DCF. Doc. 194 at 41. But this argument is a red herring. At trial, Hunter Sellers, C.T.'s boyfriend, testified that C.T. confided in him about the sexual abuse and Sellers in turn told his grandfather. Doc. 165-3 at 137. Wayne Hayes, who testified that he was Sellers's grandfather, testified that he reported the abuse in the fall of 2013 to what was then HRS, and is now DCF. *Id.* at 145. Stewart claims it is questionable that C.T. confided in Sellers, that Sellers would have been willing to lie for his girlfriend, and that Hayes was "never proven to be" Sellers's grandfather. Whether it was Hayes or someone else who made the report largely is irrelevant to the identity of the individuals in the thumbnail images.

Laughton B. Collins's statement that C.T. is a liar, Doc. 156 at 44, would have been more effective if introduced as impeachment testimony during the trial, instead of at sentencing, Doc. 194 at 40. Stewart does not indicate what testimony Carylon Collins, Clyde Collins, and Tea Open would have offered.

Third, Stewart speculates that his brother, James Houston Stewart, could have offered helpful testimony. Doc. 194 at 40-41. For example, Stewart alleges that James Stewart was purportedly present when Judy beat C.T. after learning from Stewart about the "sexting" images he found on C.T.'s phone. *Id.* at 40. Stewart also alleges that James Stewart would have testified about C.T. not acting as though she had been abused, about things Judy Stewart related to him, about C.T.'s sexual-abuse claims against her foster parents, and about C.T. running away to the home of Doug Martin. *Id.* at 40-41.

In her affidavit, Downing explains that it is her practice to rely on information from her client about what a witness will say to avoid any appearance that she has influenced the witness's testimony and to avoid the testimony sounding "rehearsed." Doc. 198-2 at 1. She does, however, have her investigator speak to witnesses when they are served, and the investigator provides a report to her. *Id.* at 2. With respect to Stewart's case, Downing recalls "talking to some of the witnesses quite a bit and some not very much depending on their availability." *Id.* at 9. Downing also states

that she consulted with Stewart and he approved "each witness that was called and the witnesses that were released." *Id.* at 2.

Downing states that some of the witnesses did not testify as expected. Additionally, she explains the reasons for not calling some of the witnesses. For instance, she did not call Cottongim because of concerns that "her testimony would tend to explain the delay in reporting the abuse." *Id.* at 7. Also, counsel did not subpoena C.T.'s friend, Tea Open, "because there was an allegation that [Stewart] had propositioned her." Doc. 198-2 at 7. Counsel avers that the witnesses listed in the case were the ones with the best testimony who were both available and willing to testify. Furthermore, Stewart's suggestion that Downing should have tried to secure witnesses who could establish an alibi is irrelevant because the exact dates of the criminal conduct were not specified. Thus, it was impossible for counsel to determine the exact time for which an alibi would have been relevant. *Id.* at 8.

Although Stewart has speculated about testimony that certain individuals could have provided, this alone is insufficient. *McKiver*, 991 F.3d at 1366; *Woodfox*, 609 F.3d at 808; *Johnson*, 256 F.3d at 1187. Even the speculative testimony, however, does not support Stewart's claim that Downing's handling of witnesses and potential witnesses was constitutionally ineffective. For example, most of James Houston Stewart's alleged testimony would have been inadmissible hearsay, irrelevant, or both, and because Judy Stewart testified at trial, counsel could have

asked her about the things she allegedly said to James Houston Stewart. Furthermore, Stewart does not even indicate what testimony Carylon Collins, Clyde Collins, and Tea Open would have offered.

Laughton B. Collins, Judy Stewart's father, is the only witness who submitted an affidavit in support of Stewart's position. Doc. 207-5. Collins states that he believes C.T. lied about the sexual abuse. *Id.* at 2-3. Collins states in a conclusory fashion that he would have known if any abuse had occurred. *Id.* at 1-3. Collins's assurance is not evidence that Stewart did not commit the offenses for which the jury convicted him. Stewart has not demonstrated that Downing was deficient for not calling Collins as a witness, and Stewart also has not shown how this caused him prejudice.

Stewart also has not shown that any of the witnesses he mentions have information relevant to the key issues in his case or material to his defense. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (noting that a defendant has a right to compulsory process of witnesses with testimony both material and favorable to the defense); *Pennington v. Spears*, 779 F.2d 1505, 1507 (11th Cir. 1986) (noting that witnesses without relevant testimony should not be called). Because Stewart was charged with the creation and possession of three depictions of sexually explicit conduct involving a minor, not the underlying sexual abuse in this case, the key issue was the identity of the individuals in the thumbnail

images on Stewart's phone and, to a lesser extent, how the thumbnails came to be on his phone. Thus, evidence that C.T. did not "act like" she had been abused, or even that she was a rebellious teenager who lied, would not have proven Stewart's innocence at trial.

Stewart's theory of defense seems to be a moving target. He first contends that C.T., Investigator Edwards, or someone else in law enforcement modified or planted the pictures on his phone and that he is not the individual depicted. Doc. 207 at 1. Alternatively, Stewart contends that the images were "nothing more than personal porn of Stewart and his wife." Doc. 194 at 59. In either event, Stewart has not shown that any of the suggested witnesses could have countered C.T.'s powerful testimony about the events in question, and the audio recording of C.T.'s reaction upon seeing the thumbnail images for the first time. Doc. 165-2 at 145.

Because Stewart has not shown that Downing's handling of witnesses fell below an objective standard of reasonableness, such that "no competent counsel" would have made the decisions that Downing made, Stewart has not shown that Downing was constitutionally ineffective. *Gordon*, 518 F.3d at 1301; *Conklin*, 366 F.3d at 1204; *Terry*, 366 F.3d at 317; *Foster v. Schomig*, 223 F.3d 626, 631 (7th Cir. 2000); *Best*, 219 F.3d at 201; *Chandler*, 218 F.3d at 1315. Additionally, even if Stewart's handling was constitutionally ineffective, the record is bereft of proof that Stewart would not have been convicted had Downing interviewed, or even called to

testify, any or all of the witnesses he now names in his motion. *Fortenberry*, 297 F.3d at 1227-28.[7] Stewart, therefore, has not demonstrated that he suffered prejudice. *Harrington*, 562 U.S. at 112 (quoting *Strickland*, 466 U.S. at 693); *Lockhart*, 506 U.S. at 369-70; *Allen*, 611 F.3d at 754.

### 2.   *Failure to Present Alternative-Identity Defense*

Stewart's second IAC claim is that Downing did not investigate the possibility of an alternative-identity defense. Doc. 194 at 42-44. According to Stewart, an alternative-identity defense may have changed the outcome of trial and "served to cause doubt" in the jury. *Id.* at 44. Stewart offers two arguments in support of this claim.

---

[7] In addition to the above evidence of Downing's conduct, it is worth noting Judge Walker's statements made at trial outside of the jury's presence:

> Mr. Stewart, I do want you to understand that there are plenty of folks, whether they hire a lawyer or one is appointed for them, that don't go to the efforts that your lawyer has done to find and locate witnesses, to secure an expert, to get extensions so that expert has time to review the materials and so forth. And she has gone above and beyond what you'd expect a lawyer to do, but it doesn't happen in every case. And she certainly has left no stone unturned, which is what we expect in our system.

Doc. 165-5 at 8. Judge Walker also noted that counsel, despite being CJA appointed, had participated in a suppression hearing, gone through voluminous records, and attempted to create a reasonable doubt by playing videos to demonstrate to the jury that C.T. did not appear to be a traumatized child who was being abused. *Id.* These comments, which relate to Stewart's claim of ineffectiveness, are part of the reason Judge Walker disqualified himself upon Stewart's motion. Doc. 216.

First, Stewart states that Downing should have argued that the blurry images depicted Stewart with his ex-wife or girlfriend, rather than a minor. Doc. 194 at 43. In support of his argument, Stewart contends that his cell phone contained numerous photos of him engaged in sexual acts with C.T.'s mother, Judy Stewart, and with his girlfriend, Kim Endress. *Id.* at 42. Stewart notes that some of the images were taken in the bedroom belonging to Stewart and Judy. He claims the female in the charged thumbnail images has platinum blond hair, but not a single photo exists of C.T. with that hair color. He also states that when Judy wore her natural hair color, she and C.T. looked very similar. In fact, he testified at trial that his first reaction when he saw the pictures was that Judy was the female depicted. Doc. 165-4 at 116.

Stewart's claim that the images depicted him with his ex-wife or girlfriend is belied by his own testimony at trial:

**AUSA:** That's C.T. in that picture, isn't it?

**STEWART:** I can't be positive, no.

**AUSA:** That's C.T. isn't it?

**STEWART:** I can't be positive, no.

**AUSA:** That doesn't look like your 13-year-old stepdaughter C.T.?

**STEWART:** It could be.

**AUSA:** That does not look like her mother Judy in her 40s, does it? You would agree at least that that is not a 40-year-old woman on the screen right now, that is a young child?

**STEWART:** It's very blurry but, I mean, I wouldn't think it would be. I don't know.

**AUSA:** And you would agree that looks like C.T., doesn't it?

**STEWART:** It favors her.

**AUSA:** That does not look like Judy, does it? That does not look like a 40-year-old woman, does it?

**STEWART:** No, I wouldn't think not.

**AUSA:** And this picture in Government's Exhibit 3, that also does not look like a 40-year-old woman, does it?

**STEWART:** From what I'm seeing, no. I can't really tell but—

*Id.* at 153-54. Additionally, Stewart repeatedly denied at trial that he was one of the individuals depicted in the photos. *Id.* at 147-48. Stewart's denial stands in stark contrast to his assertion here that the images at issue were "nothing more than personal porn of Stewart and his wife." Doc. 194 at 59. Furthermore, given Stewart's emphatic denials, it would have been counterproductive for Downing to suggest that the images depicted Stewart and an adult woman. *Presnell v. Warden*, 975 F.3d 1199, 1228 (11th Cir. 2020) ("Counsel must be reasonable, not perfect or unrelenting.").

Second, Stewart states that Downing should have argued that the images did not depict Stewart. Doc. 194 at 42-44. In support, Stewart notes that, as Judge Walker stated on the record, not even the race of the male could be determined in the first blurry image. *Id.* at 43. As noted above, however, the jury heard testimony

from Stewart that he was not the individual depicted in the images. Doc. 165-4 at 147-48. Additionally, Downing suggested that it could have been C.T. and her boyfriend in the images. Doc. 198-2 at 8.

The jury's verdict at Stewart's trial reflects that it found beyond a reasonable doubt that Stewart and C.T. were the individuals in the images recovered from his phone. Furthermore, the jury's questions during deliberation suggest that it carefully considered the question of identity, having requested at different points to be able to review the six thumbnail images, with a "blown up photo of belly comparisons"; the picture of Stewart having sex with his ex-wife; and his "selfie pics." Docs. 119, 119-1, 119-2. The evidence showed that the thumbnails in question depicted Stewart's bedroom, and there is no evidence to support Stewart's suggestion that the thumbnails depicted C.T. and one of her boyfriends. Doc. 194 at 44.

Because Stewart has not shown that in not pursuing an alternative-identity defense Downing's conduct fell below an objective standard of reasonableness, such that "no competent counsel" would have failed to pursue the defense, Stewart has not shown that Downing was constitutionally ineffective. *Gordon*, 518 F.3d at 1301; *Chandler*, 218 F.3d at 1315.

### 3.    *Failure to Investigate C.T.'s Phone*

Stewart's third IAC claim is that Downing was ineffective because she did not investigate C.T.'s HTC Sensation brand phone. Doc. 194 at 44-45. Stewart theorizes

that there may have been exculpatory data on the HTC Sensation, "such as EXIF data of the actual videos or photographs produced on C.T.'s phone, by C.T. or her boyfriend; later placed on Stewart's Droid RAZR." *Id.* at 44.

The "correct approach toward investigation reflects the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994). Counsel's obligation to render competent performance, therefore, includes "a duty to make reasonable investigations" of potential mitigating evidence "or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 691); *Holladay v. Haley*, 209 F.3d 1243, 1251-52 (11th Cir. 2000) ("Counsel have a duty to investigate but this duty is confined to reasonable investigation."). In any ineffectiveness case, an attorney's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 691). Furthermore, because the defendant bears the burden of proving counsel's ineffectiveness, "when the evidence is unclear or counsel cannot recall specifics about [her] actions due to the passage of time and faded memory, we presume counsel performed reasonably and exercised reasonably professional judgement." *Blankenship v. Hall*, 542 F.3d 1253, 1274 (11th Cir. 2008) (citation omitted).

Stewart gave C.T. the HTC Sensation phone at issue, which he later intentionally broke after discovering it contained sexting images between C.T. and a boy. Doc. 194 at 44; Doc. 207-5 at 3. Although the phone was broken, Stewart asserts it could have been hooked to a computer to access its data because neither the SIM nor the SD cards were damaged. He maintains that the EXIF and T-Mobile data from an HTC Sensation phone found on his RAZR phone should not have been found there, and this could have been the result of switching SIM or SD cards from one phone to another and syncing the card to upload data onto his RAZR. Doc. 194 at 45. He further claims that it was "impossible to find images of C.T. performing oral sex on him because he had never done such a thing with his step-daughter," and he suggests that the images found on his phone may have been the "sexting" images he found on C.T.'s phone. *Id.* at 44.

Stewart complains that Downing did not request subpoenas for the HTC Sensation because it "was a lot of work and expense." *Id.* at 45. He posits that EXIF data from the HTC Sensation would have changed the outcome of the trial because the EXIF data would have proven that the images were produced on C.T.'s phone while in her possession.

Downing states in her affidavit that she does not recall whether she investigated C.T.'s phone or why there was no forensic analysis performed on the phone. Doc. 198-2 at 3. She states that the phone could have been broken before

Stewart's arrest, which is a logical conclusion in light of his admission that he is the person who broke it. Doc. 194 at 44. Alternatively, if law enforcement did not seize the broken phone, the defense would not have had access to it through *Brady* discovery. Doc. 198-2 at 3. Later in her affidavit, counsel indicated that she remembers wanting to see the phone, but it had not been seized by law enforcement and she did not subpoena the phone because she did not know from where she could have obtained the phone. *Id.* at 10.

Given the "heavy measure of deference to counsel's judgments," it does not appear that Downing could have done further investigation or that it would have been fruitful. *Strickland*, 466 U.S. at 691; *Blankenship*, 542 F.3d at 1274. Stewart's theory about the origin of the images found on his cell phone is entirely speculative. So is his assertion that if the original video or photographs would have been discovered, he would have been exonerated. Doc. 194 at 45. Additionally, the HTC Sensation data on his phone could have been explained by the fact that, according to the testimony of Stewart's ex-wife, the entire family had HTC Sensation phones at one time. Doc. 165-3 at 267. Stewart, therefore, has not carried his burden to show that Downing was constitutionally ineffective for failing to investigate or that Stewart suffered prejudice as a result. *Roberts v. Wainwright*, 666 F.2d 517, 519 n.3 (11th Cir. 1982).

### 4.    *Failure to Present an Alibi Defense*

Stewart's fourth IAC claim faults Downing for not presenting Facebook, GPS, and alibi defenses.[8] In his section 2255 motion, Stewart notes that Counts One through Three of the indictment charged offenses that occurred in September, October, and November 2013, respectively. Doc. 194 at 45-46 (citing Doc. 1). Essentially, he claims that evidence from either Verizon wireless or from his former employer was available to counsel to prove Stewart was not at home when the alleged abuse occurred. *Id.* at 46.

An attorney may render ineffective assistance under *Strickland* when he fails to investigate and present possible alibi or other exculpatory testimony. *See, e.g.*, *Khan v. United States*, 928 F.3d 1264, 1278 (11th Cir. 2019) (explaining that deficient performance may be shown where "defense counsel utterly failed to investigate potential witnesses or secure their testimony"). As with all IAC claims, the defendant bears the burden of proving that, in not presenting alibi evidence, counsel's conduct fell below an objective standard of reasonableness, such that "no competent counsel" would have failed to present that evidence and resulting prejudice. *Gordon*, 518 F.3d at 1301; *Chandler*, 218 F.3d at 1315.

Stewart asserts that Downing questioned Jennifer Dalmida, a government witness from Verizon wireless, about whether it was possible to subpoena all of the

---

[8] Facebook is not mentioned again in this section of Stewart's motion.

GPS locations for the phone, and Dalmida responded this would have been possible. Doc. 194 at 46. Additionally, Stewart claims that his former employer, Mercer Trucking, could have provided evidence impeaching C.T.'s claim that the abuse started in Ohio during the summer of 2011. *Id.* According to Stewart, he was on a trucking run in 2011 and, because he was a contractor working for the military, his movements were tracked every fifteen seconds. *Id.*

It is unclear how Stewart believes this evidence could have created an alibi with respect to the thumbnails. First, Stewart is overstating Dalmida's testimony. Dalmida testified that Verizon could determine within a five-mile radius—not the exact location—where a cell phone began and ended a call. Doc. 165-2 at 235. Additionally, the indictment charged that the offenses happened "on or about" certain dates, and the jury was instructed that the government was not required to prove that the crime occurred on an exact date, but instead on a date reasonably close to the date alleged. Doc. 117-5 at 7; *United States v. Padgett*, 852 F. App'x 408, 413 (11th Cir. 2021) (noting that an allegation that an offense occurred "on or about" a certain date is sufficient to put the defendant "on notice that the charge is not limited to the specific date or dates set out in the indictment") (quoting *United States v. Reed*, 887 F.2d 1398, 1403 (11th Cir. 1989)). Even if the indictment had listed a specific date, trial testimony established that the dates on which the thumbnails were created are not necessarily the same as the date on which the original photo or video was

created. Doc. 165-2 at 197-98, 299-302. That is because the thumbnail images, according to government witness Brian Draper ("Draper"), are smaller versions of a picture that are rendered by a device, typically made when a picture is previewed from a gallery. *Id.* at 197-98.

As there was no evidence establishing the date the original images were rendered, there was no firm date on which to create an alibi defense. Downing, therefore, was not constitutionally ineffective for failing to pursue the alibi defense Stewart now proposes, even if Verizon and employment records had been available. *Gordon*, 518 F.3d at 1301; *Chandler*, 218 F.3d at 1315.

### 5. *Failure to Investigate the JCSO Policy and Facebook*

Fifth, Stewart claims that Downing was constitutionally ineffective because she failed to investigate the JCSO Policy regarding the chain of custody of evidence and, separately, Facebook. Doc. 194 at 46-47.

As noted above, counsel is obligated to make "reasonable investigations" of potential mitigating evidence "or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 691); *Holladay*, 209 F.3d at 1251-52. In any ineffectiveness case, an attorney's "decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Wiggins*, 539 U.S. at 521-22 (quoting *Strickland*, 466 U.S. at 691); *Rogers*, 13 F.3d

at 387 (noting that "lawyers do not enjoy the benefit of endless time, energy or financial resources").

### (a).   The JSCO Policy

Stewart claims that Investigator Edwards did not follow JCSO Policy and that the evidence—Stewart's cell phone—was not protected from spoliation. Doc. 194 at 46.

First, Stewart does not explain how Edwards's allegedly improper handling of the cell phone resulted in "spoliation." He instead speculates that her actions in powering on and "manipulating" data on the phone destroyed unspecified exculpatory evidence, but he offers no proof in support of his claim. *Id.* at 47. Second, at Stewart's second trial, Edwards was subject to cross-examination about her handling of Stewart's cell phone. Investigator Edwards testified that she had training on chain-of-custody and evidence control, and while it was the best policy to turn in evidence to an evidence custodian, that was not the JCSO policy. Doc. 165-2 at 166-67; *see id.* at 158, 165. It is unclear, therefore, how investigating JCSO's policy would have aided Stewart's defense. Finally, the undersigned notes that suggestions of possible data manipulation or sloppy chain-of-custody controls were part of the defense at trial, and counsel explored this issue through defense computer expert Charles Snipes's ("Snipes") testimony. Doc. 165-3 at 176-215.

Because Stewart has not shown that in not investigating the JCSO policy Downing's conduct fell below an objective standard of reasonableness, such that "no competent counsel" would have failed to investigate the JCSO policy, Stewart has not shown that Downing was constitutionally ineffective or resulting prejudice. *Gordon*, 518 F.3d at 1301; *Chandler*, 218 F.3d at 1315.

### (b).   Facebook

Stewart also claims he told Downing that she should "investigate Facebook to rebut some of C.T.'s testimony." Doc. 194 at 47. Specifically, Stewart alleges that Facebook (1) would have proven that C.T. never had patches of hair missing because there were photos of her visits to the hairdresser without comments about missing hair; and (2) reflected that C.T. loved spending time with Stewart, instead of C.T.'s alleged injuries or her alleged terror of Stewart. *Id.* According to Stewart, Downing assured Stewart that she had looked at the Facebook pages of Judy, C.T., and Stewart, and that she would have her investigator, David, look at the pages so he could be called to testify about what he found. *Id.*

Downing states that she did research social media postings "to the extent that [she] was able to see public posts." Doc. 198-2 at 4. Although she did not recall specifically discussing Facebook posts with Stewart, Downing introduced into evidence photographs and videos of C.T. and Stewart interacting "normally." *Id.* at

10-11. She indicates she does not know what Facebook photos would have added to Stewart's defense. *Id.*

Stewart offers no evidence in support of his assertion that photos on C.T.'s Facebook would have revealed that C.T. visited hairdressers without comments about missing hair.[9] Additionally, as noted above, counsel introduced evidence that C.T. and Stewart had a "normal" relationship. Doc. 198-2 at 10-11. Any potential evidence uncovered by an investigation of C.T.'s Facebook, therefore, would have been largely cumulative.

Because Stewart has not shown that Downing failed to investigate Facebook, or that in failing to do so, Downing's conduct fell below an objective standard of reasonableness, such that "no competent counsel" would have failed to investigate Facebook, Stewart has not shown that Downing was constitutionally ineffective. *Gordon*, 518 F.3d at 1301; *Chandler*, 218 F.3d at 1315. Additionally, because the suggested Facebook evidence would have been largely cumulative of evidence presented at Stewart's trial, Stewart has not shown prejudice. *See Dallas v. Warden*, 964 F.3d 1285, 1310 (11th Cir. 2020) ("[N]o prejudice can result from the exclusion of cumulative evidence.") (citations omitted).

---

[9] Notably, Hunter Sellers testified about seeing patches on C.T.'s head where hair had been missing and had started to grow back. Doc. 165-3 at 136-37.

6.    *Alleged Violation of the Speedy Trial Act*

Sixth, Stewart claims counsel was constitutionally ineffective because she did not address the alleged speedy-trial violation under 18 U.S.C. § 3161. Doc. 194 at 47-50.

Pursuant to the Speedy Trial Act of 1974, trial must "commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). The indictment against Stewart was returned in open court on September 17, 2014.[10] Doc. 1. Stewart was arrested and first appeared before Magistrate Judge Larry Bodiford on October 7, 2014, and Judge Bodiford set the trial for December 8, 2014, well within the 70-day limit. Docs. 8, 11.

After Stewart's original attorney, Michelle Spaven, developed a conflict and moved to withdraw on November 17, 2014, the court appointed Downing to represent Stewart. Docs. 16, 17, 18. On December 1, 2014, Downing simultaneously filed a notice of appearance and a motion to continue trial. Docs. 19, 20. In the

---

[10]   Stewart also claims that there was some irregularity in the indictment because it was signed on "7/17/14" and the date is altered to "9/17/14." Doc. 1. Assuming for sake of argument that this was correct, Stewart cannot show any prejudice because as the statute provides—and the Eleventh Circuit has confirmed—the relevant date triggering the 70-day period is when the indictment is returned in open court, not when it was handed down by the grand jury. *See United States v. Jurn*, 766 F.2d 465, 466-67 (11th Cir. 1985).

motion to continue, she represented that Stewart had "previously waived his right to a speedy trial and herein does so again for the purposes of this continuance." Doc. 20 at 1. The court granted the motion, finding that the failure to grant the continuance would deny Stewart a fair trial. Doc. 21. Counsel repeated the same language concerning Stewart's waivers in motions to continue filed on January 29, 2015 and March 3, 2015. Docs. 25, 28.

At the motions hearing on March 4, 2015, Stewart was called to testify about his understanding of his right to a speedy trial and his decision to waive this right. Doc. 160 at 20-21. After Stewart testified that he understood that counsel was requesting time to schedule a competency examination and it could be an extended period of time before he proceeded to trial, Stewart testified that he wanted to waive his speedy-trial right.[11] *Id.*

Stewart claims that he was prejudiced because the delay in his trial resulted in witnesses on both sides having difficulty with recall, and Kim Endress, who testified through video, was unable to make an in-person court appearance due to complications with her pregnancy. Doc. 194 at 48. Stewart also claims that he was

---

[11] Before the motions hearing on March 4, 2015, the record did not reflect a previously filed speedy-trial waiver. Doc. 160 at 18-19. But on March 31, 2015, Downing filed the "Waiver of Rights under Speedy Trial Act" form that Stewart and his original attorney signed months earlier on November 14, 2014. Doc. 37.

prejudiced by the delay of his trial because he is innocent and has never indicated to anyone that he would consider pleading guilty. *Id.*

Stewart's belief in hindsight that it may have been advantageous in some respects not to delay the trial does not render his speedy-trial waiver invalid. Docs. 20, 21, 25, 28, 37, 160 at 20-21. Additionally, Stewart's assertion that he never indicated that he would consider pleading guilty is false. *See* Doc. 165-4 at 65-66 (noting on the record that the proceedings had been delayed several hours to allow Stewart to meet with counsel and decide whether he wanted to plead guilty).

Because Stewart has not shown that his speedy-trial rights were violated, Stewart has not shown that Downing was constitutionally ineffective for failing to address this alleged issue or that Stewart suffered prejudice as a result. *Gordon*, 518 F.3d at 1301; *Chandler*, 218 F.3d at 1315.

## B.  Ground One—Ineffective Assistance of Appellate Counsel ("IAAC")

As noted above, Stewart was represented on appeal by Ryan Truskoski, whose practice is limited to appellate and post-conviction work. Doc. 198-1 at 1. Stewart argues that Truskoski was constitutionally ineffective in five ways. Doc. 194 at 4, 14-35.

IAAC claims are governed by the same *Strickland* standards that apply to trial counsel. *Philmore v. McNeil*, 575 F.3d 1251, 1264 (11th Cir. 2009). To prevail on an IAAC claim, therefore, a defendant must show that "(1) appellate counsel's

performance was deficient, and (2) but for counsel's deficient performance [the defendant] would have prevailed on appeal." *Shere v. Sec'y, Fla. Dep't of Corr.*, 537 F.3d 1304, 1310 (11th Cir. 2008).

Although it is possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim on appeal, it is difficult to show in such a situation that counsel's performance was constitutionally ineffective. *Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017); *Payne v. United States*, 566 F.3d 1276, 1277 (11th Cir. 2009). That is because the Sixth Amendment does not require appellate advocates to raise every nonfrivolous issue on appeal if counsel, as a matter of professional judgment, decided not to do so. *Davila*, 137 S. Ct. at 2067 (first citing *Smith v. Murray*, 477 U.S. 527, 536 (1986); then citing *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)); *Brown v. United States*, 720 F.3d 1316, 1335 (11th Cir. 2013). "Declining to raise a claim on appeal . . . is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court." *Davila*, 137 S. Ct. at 2067 (citing *Smith v. Robbins*, 528 U.S. 259, 287-88 (2000)). To show prejudice in the context of an appeal, the arguments that counsel allegedly failed to raise must have been sufficiently significant to have affected the outcome of the appeal. *Miller v. Dugger*, 858 F.2d 1536, 1538 (11th Cir. 1988).

1.    ***Failure to Challenge the Denial of Stewart's Motion to Suppress***

Stewart first contends that Truskoski was ineffective because he failed to challenge on appeal the denial of Stewart's motion to suppress the evidence discovered during the search of Stewart's cell phone. Doc. 194 at 4, 14-26.

Stewart did not file a motion to suppress evidence before his first trial. But as a result of new evidence learned during the course of that trial, Stewart moved to suppress from his second trial his cell phone and any evidence obtained from the phone. Doc. 92. The motion purported to identify six reasons to suppress the phone.

First, Stewart claimed that the state search warrant and the affidavit in support thereof was "invalid on its face" because (1) it did not cite the correct statute; (2) it contained a typographical error, referring to the download of "tests" rather than "texts"; and (3) it contained only a generic description of the phone. *Id.* at 1. Second, Stewart asserted that the affidavit in support of the warrant had material factual omissions—his denial of guilt and his statement that other phones on his account should be searched and seized—and false statements—descriptions of incidents of domestic violence. *Id.* Third, Stewart claimed that the affidavit and search warrant were deficient because neither alleged a time frame in which the videos were created, accessed, or deleted. *Id.* Fourth, he asserted that the investigator failed to serve the warrant on him when she seized the phone, and the serial number of the phone was not recorded. *Id.* Fifth, he claimed that the chain-of-custody procedure was not

followed, and the phone was not properly secured for evidence retention. Doc. 92 at 2. Finally, Stewart maintained that data on the phone was altered after the seizure of the phone. *Id.* He claimed that, before the phone was transferred to the FDLE, a JCSO deputy manipulated and downloaded the cell phone, which could have modified some of the original data. He further posited that the FDLE's and HSI's subsequent searches also may have modified the contents of the phone.

Judge Walker denied Stewart's motion after a lengthy hearing. Docs. 110, 164. With respect to Stewart's first ground, Judge Walker found that the claim was both untimely and without merit for two reasons. First, the misspelling of the word "text" and the citation to the wrong statute within the application for the search warrant were typographical errors that were not material deficiencies. Doc. 164 at 11. Second, the search warrant's description of Stewart's cell phone was sufficient because the warrant detailed the type and color of the cell phone; the cell phone's assigned number; and that the cell phone would be located on Stewart's person. *Id.* at 12. Thus, the warrant was valid on its face, supported by probable cause, and properly issued. *Id.* at 13.

With respect to Stewart's second ground, the alleged omissions from and false statements in the search warrant, Judge Walker found no evidence that the affiant was reckless with regard to the facts in her affidavit. *Id.* at 13-22. He specifically found that the state judge who issued the warrant was aware that the alleged victim

had made inconsistent statements concerning her contact with Stewart and that the judge was able to take those inconsistencies into consideration in determining whether probable cause existed. *Id.* at 20.

Although Judge Walker did not specifically address Stewart's third ground—the affidavit's failure to allege a time frame in which the videos were created, accessed, or deleted—that issue likely was subsumed in his ruling that no *Franks* hearing was needed. *See United States v. McMurtrey*, 704 F.3d 502, 508 (7th Cir. 2013) (noting that a *Franks* hearing is necessary when the defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause") (quoting *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)). With respect to Stewart's fourth ground, although the parties disagreed whether Investigator Edwards had served Stewart with a copy of the warrant, Judge Walker found that there was no showing of prejudice or bad-faith noncompliance with the rules, and that Stewart's claim that no one discussed the contents of the search warrant with him was undermined by statements within the warrant itself. Doc. 164 at 27.

After addressing grounds one through four in Stewart's motion to dismiss, Judge Walker turned to grounds five and six. Specially, Stewart's claims that the

phone had not been secured properly after it was seized and that data had been modified or manipulated. *Id.* at 32-169.

In moving to suppress the cell phone, Stewart argued that the phone was not in substantially the same condition it was at the time it was seized. He claimed that the downloads or updates that occurred while the phone was in law-enforcement custody altered the connection between him and the offense. *Id.* at 155. At the suppression hearing, Snipes testified that cell-phone examinations are typically conducted in "airplane mode" to prevent the phone from being "wiped" remotely and to prevent other data from being downloaded. *Id.* at 44-46. In this case, there was evidence of calls and/or text messages coming through while Stewart's cell phone was in law-enforcement custody, meaning that the phone was not in airplane mode when this happened. The defense argued that the thumbnail images at issue in this case may have been affected by any or all of the "power-on events" that occurred while the phone was in law-enforcement custody. Furthermore, although law enforcement kept written notations of when the cell phone was accessed, these records were shown to be incomplete.

Judge Walker held that any potential chain-of-custody issues affected "the weight, not the admissibility of the evidence." *Id.* at 160. In support of his holding Judge Walker observed that, given the nature of technology, if an item had to be in exactly, rather than substantially, the same condition at the time of the seizure, no

phone or computer would ever be admissible in any court. Doc. 164 at 163. He found no evidence that the cell phone was altered in any material respect that would have precluded its admissibility or that there was a chain-of-custody violation. *Id.* at 164, 166. Notably, neither the data being presented nor the authenticity of the thumbnail images at issue in the case were undermined. *Id.* at 164-66. Furthermore, Judge Walker found that there was no evidence of wrongdoing attributable to law enforcement. *Id.*

In his section 2255 motion, Stewart now contends that an appellate challenge to Judge Walker's denial of Stewart's motion to suppress had a higher likelihood of success than the two issues Truskoski raised on appeal. Doc. 194 at 26. Truskoski vehemently disagrees with Stewart's conclusion. Counsel states in his affidavit that he raised on appeal the only two non-meritless issues in Stewart's case. Doc. 198 at 2.

In challenging Truskoski's decision not to address the motion to suppress on appeal, Stewart has not cited any case law—and the undersigned has found none— that would support Stewart's position that the cell phone was inadmissible. Doc. 194 at 26-27. For example, admissible evidence must be in substantially the same condition as when the crime was committed. *United States v. Dewitt*, 943 F.3d 1092, 1098 (7th Cir. 2019) (citation omitted); *United States v. Garcia*, 718 F.2d 1528, 1533-34 (11th Cir. 1983). Additionally, it is well established that the government

need take only reasonably precautions to preserve evidence and that any chain-of-custody issues go to the weight, not the admissibility, of evidence. *Dewitt*, 943 F.3d at 1098. Stewart has not shown that his cell phone was not substantially in the same condition as when the cell phone was seized. *Garcia*, 718 F.2d at 1534 (noting that in the absence of any evidence to the contrary, a district court is entitled to assume that an official would not tamper with the exhibits) (citing *Brewer v. United States*, 353 F.2d 260, 262 (8th Cir. 1965)). Furthermore, he has not shown that Judge Walker's ruling was either factually or legally infirm.

Because Stewart has failed to establish that, in not raising on appeal Judge Walker's denial of Stewart's motion to suppress, Truskoski's conduct fell below an objective standard of reasonableness, such that "no competent counsel" would have failed to raise this issue, Stewart has not shown that Truskoski was constitutionally ineffective.[12] *Gordon*, 518 F.3d at 1301; *Chandler*, 218 F.3d at 1315. Additionally, Stewart has not shown resulting prejudice because he has not established that a motion-to-suppress argument would have been "sufficiently significant to have

---

[12] Stewart also claims that the state-court judge who signed the warrant: (1) was biased in favor of Judy Stewart because the judge had previously represented her when he was in private practice; (2) backdated the warrants to allow Investigator Edwards time to plant the images on the phone; and (3) did not have jurisdiction to issue search and arrest warrants. Doc. 194 at 17. None of these arguments, however, were raised at the motion-to-suppress hearing.

affected the outcome of the appeal. *Miller*, 858 F.2d at 1538. Thus, Stewart is not entitled to relief on his first IAAC claim.

### 2. *Appellate Counsel Did Not Have the Entire Record*

Stewart's second IAAC claim is that appellate counsel's performance was deficient because counsel did not have the complete record to review. Doc. 194 at 26-27. Specifically, Stewart maintains that counsel did not have transcripts of Investigator Edwards's testimony or defense expert Snipes's forensic report after the examination of the phone. *Id.* at 26. As support, Stewart points to Truskoski's October 2, 2017 letter, which was written after the mandate had issued in the direct appeal. Doc. 187-3 at 2. Although most of the letter discussed Stewart's post-appellate options, it also included Truskoski's response to Stewart's request for certain items. Truskoski told Stewart that he "could not find the transcript excerpt of the recording from the *first trial* of Officer Edwards' testimony," and he did "not have the report from expert Charles Snipes" but that this was something Stewart's trial counsel would have. Doc. 187-3 at 2 (emphasis added).[13]

---

[13] Stewart's reference is to "Apndx. Ex. C" (Appendix Exhibit C) in his first amended section 2255 motion, Doc. 187, which was stricken from the record, Doc. 190. It goes without saying that striking a pleading also strikes any attachments or exhibits filed with the pleading. Stewart did not resubmit exhibits with the instant section 2255 motion. The undersigned nonetheless advised Stewart, in response to his "Motion Requesting Clarification," that he would consider all the exhibits Stewart submitted, including those he did not resubmit, in preparing the instant report and recommendation. Doc. 209.

Stewart's argument is meritless for several reasons. First, Stewart does not explain—in his second amended section 2255 motion or reply—how counsel's possession of either of these two items would have changed the claims counsel raised on appeal or the outcome of the appellate proceedings.[14]  Second, Truskoski, in his affidavit, avers that the record was complete, that he had everything necessary to represent properly Stewart, and that the Court of Appeals could have ordered the appellate record to be supplemented if the record was incomplete. Doc. 198-1 at 2. Finally, Stewart's conclusory assertion that it is "easy to conclude that Truskoski reviewed very little of the record when considering the two still-born issues he raised on appeal," Doc. 194 at 27, does not show that counsel failed to investigate or consider other appellate issues. Truskoski "was in regular communication with [Stewart] and [Stewart] had a full voice on what arguments he wanted raised on appeal." Doc. 198-1 at 2. Counsel further opines that he "raised every possible meritorious issue on appeal" and that "any other issue would have been meritless." *Id.* Although Stewart claims that Truskoski wrote Stewart only one letter asking his opinion about potential appellate issues, Doc. 207-3 at 2, this does not show that Truskoski was constitutionally ineffective.

---

[14] Although Stewart suggests that it is "undetermined how much more of the record Truskoski lacked," Doc. 194 at 26, this is abject speculation.

Stewart has not shown that Truskoski's handling of the record on appeal fell below "an objective standard of reasonableness," such that "no competent counsel" would have handled the record as Truskoski did. *Chandler*, 218 F.3d at 1315. Additionally, even if Stewart's assertion that appellate counsel did not have the entire record is true, he has not shown how he was prejudiced. That is, Stewart has not shown a substantial likelihood that the outcome of his appeal would have been different. *Harrington*, 562 U.S. at 112. Stewart, therefore, is not entitled to relief on his second IAAC claim.

### 3.    *Brady Violations*

Stewart next asserts that Truskoski failed to raise three separate *Brady* violations. Doc. 194 at 27-32. Specifically, Stewart alleges that Truskoski should have challenged on appeal the government's alleged (1) refusal to allow the defense expert Snipes access to Stewart's actual cell phone; (2) withholding of the defense expert's forensic report made from the mirrored thumb drive of the phone; and (3) withholding of the FDLE "triage report" created by Draper. *Id.* Because Plaintiff must first show that the government committed the alleged *Brady* violations before he can allege that Truskoski was constitutionally ineffective for failing to raise on appeal the alleged violations, the undersigned will address the merits of these alleged *Brady* violations. *United States v. Stein*, 846 F.3d 1135, 1145 (11th Cir. 2017)

(noting that the defendant bears the burden of showing that a *Brady* violation has occurred) (quoting *United States v. Esquenazi*, 752 F.3d 912, 933 (11th Cir. 2014)).

"There is no general constitutional right to discovery in a criminal case . . . ." *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977). A prosecutor, therefore, has "no duty" to provide a defendant with "unlimited discovery of everything known by the prosecutor." *United States v. Agurs*, 427 U.S. 97, 106 (1976); *id.* at 111 (rejecting the idea "that the prosecutor has a constitutional duty routinely to deliver his entire file to defense counsel"). In *Brady v. Maryland* and its progeny, however, the Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires the government to disclose to a criminal defendant material evidence known to the government that is exculpatory or could be used to impeach a significant government witness. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Giglio v. United States*, 405 U.S. 150, 154 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Such evidence is commonly referred to as "*Brady* material" or "*Brady* evidence." This duty applies whether or not the defendant requests the production of such evidence. *Kyles*, 514 U.S. at 433-34; *Agurs*, 427 U.S. at 110; *United States v. Scheer*, 168 F.3d 445, 451 (11th Cir. 1999) (noting that, "regardless of request, favorable, exculpatory or impeachment evidence is material") (quoting *United States v. Noriega*, 117 F.3d 1206, 1218 (11th Cir. 1997)).

To prove a *Brady* violation, a defendant must show that: (1) the prosecution possessed exculpatory or impeachment evidence favorable to the accused; (2) the defendant neither possessed nor could have obtained the evidence himself with reasonable diligence; (3) the prosecution failed to disclose the favorable evidence to the defendant; and (4) had the evidence been revealed to the defense, there is a reasonable probability that the outcome of the proceedings would have been different, that is, that the evidence was "material." *Stein*, 846 F.3d at 1145-46 (quoting *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002)). Evidence is "material" if there is a reasonably probability that a different outcome would have ensued with the evidence. *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1292 (11th Cir. 2012). A "reasonable probability" is a "probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682 (quoting *Strickland*, 466 U.S. at 694); *Kyles*, 514 U.S. at 434; *Scheer*, 168 F.3d at 451-52. As noted above, the defendant bears the burden of showing that a *Brady* violation occurred. *Stein*, 846 F.3d at 1145 (quoting *Esquenazi*, 752 F.3d at 933).

### (a).    The Defense Expert's Access to the Cell Phone

First, Stewart asserts that the government suppressed the physical device— his actual cell phone—instead allowing the defense computer expert Snipes to access only a thumb drive created by HSI. Doc. 194 at 27-28. Stewart asserts that Snipes found evidence, which he presented at the suppression hearing, that six thumbnail

images had been simultaneously changed on May 14, 2014, while the phone was in the custody of Investigator Edwards, and that an imaging manipulation software called Picasa had been accessed around that time. *Id.*; Doc. 164 at 69-73. Stewart claims that Snipes testified at the suppression hearing that had Snipes been allowed to examine the phone, he believed he likely could have found evidence showing the phone had been "tampered with" while in Investigator Edwards's custody. Doc. 194 at 28.

The undersigned does not read Snipes's testimony either at the suppression hearing or at trial to imply that he would have found evidence of tampering if he had been allowed to examine the cell phone. Instead, Snipes testified that, although he was denied access to Stewart's cell phone, he was confident that the image that HSI produced was "an accurate representation of the physical image of the phone at the time [the HSI] examiner did the extraction." Doc. 164 at 62. Snipes conceded that he could not opine whether the six thumbnail images were affected when the cell phone was powered on during law enforcement's investigation. *Id.* at 111. Snipes's testimony alone, therefore, undermines Stewart's claim that the government committed a *Brady* violation by suppressing his actual cell phone.

Judge Walker's findings further undermine Stewart's argument. Judge Walker found that the phone was in substantially the same condition as when it was seized and that there was no evidence that the dates connected to the six thumbnails, or the

thumbnails themselves, had been created at some other time. *Id.* at 165. Judge Walker also found credible Investigator Edwards's testimony that she did not manipulate or intentionally alter or tamper with the evidence on Stewart's phone. *Id.* at 133, 165.

Given the above evidence, Stewart has not shown that the prosecution withheld exculpatory or impeachment evidence that was material. Stewart, therefore, has not proven a *Brady* violation. *Stein*, 846 F.3d at 1145-46 (quoting *Vallejo*, 297 F.3d at 1164). Because Stewart has not shown that a *Brady* violation occurred, Stewart also cannot show that appellate counsel was constitutionally ineffective for failing to raise on appeal this alleged *Brady* violation. *Philmore*, 575 F.3d at 1264.

### (b). The Defense Expert's Forensic Report

Second, Stewart asserts that the government's failure to return Snipes's forensic report was a *Brady* violation. Doc. 194 at 28-31. Using a cell-phone software, Snipes produced a one-thousand-page report of the thumb drive created by HSI, which he left with the government to review and ensure that the report did not contain the reported images of child pornography. Doc. 164 at 120. Snipes stated that as of the date of the suppression hearing, he had not received the report back from the government. *Id.* at 121. Stewart now claims that Snipes's report contained material evidence under *Brady*. Doc. 194 at 28-31.

Stewart's suggestion that the report contained favorable evidence, however, is mere speculation: "Stewart *wonders* what more could have been found in Snipes's report that was confiscated by the AUSA." *Id.* at 29 (emphasis added). Even in his reply, Stewart characterizes the report as "helpful" and states that "[m]ore likely than not the report contained exculpatory evidence." Doc. 207 at 10. Because Stewart does not identify the "helpful" or "exculpatory" evidence that the report allegedly contained, or how that evidence would have altered the outcome of the proceedings, Stewart has not carried his burden to show that the government committed a *Brady* violation. *Stein*, 846 F.3d at 1145-46 (quoting *Vallejo*, 297 F.3d at 1164). Stewart, has failed, therefore, to show that Truskoski was constitutionally ineffective for failing to raise on appeal this alleged *Brady* violation. *Philmore*, 575 F.3d at 1264.

### (c).    Draper's Triage Report

Third, Stewart asserts that the government committed a *Brady* violation when it failed to turn over the triage report allegedly created by FDLE employee Draper.[15] Doc. 194 at 31-32. Stewart describes the form as:

> a chain of custody form showing that an examination was done, the date, identifying information of the device examined, who brought the device to FDLE, condition of the device, verification that a search warrant accompanied the device to be searched, etc.

---

[15] Draper testified that he was not a sworn law-enforcement officer. Doc. 165-2 at 196.

*Id.* at 32. According to Stewart, Draper either lied about the existence of the form he claims to have filled out, or the AUSA improperly withheld the form from the defense. *Id.* at 31. Stewart now claims that without the form there was no evidence corroborating that Draper examined the phone. *Id.* at 32.

But Stewart does not explain why he believes this form constituted *Brady* evidence, and nothing about Draper's testimony suggests that the form contained exculpatory or impeachment evidence. Doc. 164 at 145; Doc. 165-2 at 193, 200, 203. Furthermore, there was at least one chain-of-custody form entered into evidence, Doc. 165-2 at 248-49, and the government was not required to provide Stewart with every chain-of-custody form in its possession, unless the chain-of-custody form contained exculpatory or impeachment evidence. *Agurs*, 427 U.S. at 106 (noting that the government has "no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor").

Because Stewart has not shown that the triage form contained *Brady* material, Stewart has not carried his burden to show that the government committed a *Brady* violation. *Stein*, 846 F.3d at 1145-46 (quoting *Vallejo*, 297 F.3d at 1164). Thus, as with Stewart's other alleged *Brady* violations, Stewart has failed to show that Truskoski was constitutionally ineffective for failing to raise on appeal this alleged *Brady* violation. *Philmore*, 575 F.3d at 1264.

### 4.    *Admission of "Peek-a-Boo" Images*

Stewart's fourth IAAC claim addresses Truskoski's failure to challenge on appeal Judge Walker's admission of the "peek-a-boo" images to which trial counsel had objected.[16]  Doc. 194 at 32-33; *see* Doc. 102 at 47. Stewart contends that these images were "far more prejudicial than the fifteen images challenged on appeal because they were offered to show that Stewart was the kind of person who would produce child pornography." Doc. 194 at 32. Although he stops short of denying that he took the photos, Stewart states that there was no evidence to prove they were taken by his phone and that they "may just as well have been created by Edwards, used to bolster her report, [and] created the same day she went to the Stewart home to take her comparison images of the bedroom and bathroom." *Id.* He also suggests that his youngest daughter, H.S., or even C.T. herself may have taken the photos. *Id.* at 33; Doc. 102 at 43.

The fact that the presence of the photos on Stewart's phone was prejudicial does not render their admission improper. Judge Walker conducted the Rule 403 balancing test and found the photos more probative than prejudicial, particularly in light of Stewart's defense that the thumbnail images had been planted on his cell phone. *See* Doc. 165-2 at 7-9; Doc. 102 at 45-46. Additionally, these photos, unlike

---

[16] The images to which Stewart refers are images taken from under the door or in the shower of a bathroom used by C.T. and others in the house.

the photos challenged on appeal, were actually taken at Stewart's residence, providing a closer nexus to the alleged criminal activity. A challenge to Judge Walker's well-reasoned ruling would have been unlikely to succeed on appeal, and Stewart has not shown Truskoski was constitutionally ineffective for failing to raise this issue or that he suffered resulting prejudice. *Davila*, 137 S. Ct. at 2067; *Brown*, 720 F.3d at 1335; *Payne*, 566 F.3d at 1277; *Miller*, 858 F.2d at 1538.

### 5.    *Failure to Raise the Dost Factors*

Stewart's last IAAC claim is that Truskoski should have argued that the six thumbnail images failed to meet the definition of "child pornography" under 18 U.S.C. § 2256(2), (8), or (9), and that the trial court erred in not applying the "*Dost* test" to the images.[17] Doc. 194 at 33-36. Stewart contends that the images in

---

[17] The "*Dost* test" to which Stewart refers is actually a multifactor analysis articulated in *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986). *Dost*'s multifactor analysis includes six factors:

(1)    whether the focal point of the visual depiction is on the child's genitalia or pubic area;

(2)    whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

(3)    whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

(4)    whether the child is fully or partially clothed, or nude;

(5)    whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

(6)    whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

question were so blurry that in many of them a sexual act could not be distinguished. *Id.* at 33.

Under 18 U.S.C. § 2256, "child pornography" is defined, in part, as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8)(A). Section 2256 defines an "identifiable minor" as "a person who was a minor at the time the visual depiction was created, adapted, or modified." *Id.* § 2256(9)(A)(i)(I). Additionally, section 2256 defines "sexually explicit conduct" to include a number of activities, including oral-genital sexual intercourse and "graphic or simulated lascivious exhibition of the anus, genitals, or pubic area of any person." *Id.* § 2256(2)(A)(i), (v). Courts have used the multifactor analysis articulated in *Dost* to determine if there was sufficient evidence for a jury to conclude that a particular photograph (that does not depict sexual contact) is a "lascivious exhibition" of the anus, genitals, or pubic area of a minor. *United States v. Hunter*, 720 F. App'x 991, 996 (11th Cir. 2017) (citing cases); *United States v. Grzybowicz*, 747 F.3d 1296, 1305-06 (11th Cir. 2014).

---

*Dost*, 636 F. Supp. at 832.

At the outset, the photos in this case were alleged to have depicted oral-genital sexual intercourse, which, as noted above, qualifies as "sexually explicit conduct" and is sufficient alone to support a conviction for violating 18 U.S.C. § 2251(a). The *Dost* factors, therefore, were neither relevant nor necessary to the government's theory of the case. Nonetheless, the jury was instructed on the definition of "lascivious exhibition" because the *Dost* factors are included in the Eleventh Circuit's pattern jury instructions for violations of both 18 U.S.C. §§ 2251(a) and 2252A(a)(2)(A) and (5)(B). *See* 11th Cir. Pattern Jury Instr. (Crim.) 82, 83.4A (2010).

With respect to Stewart's claim that the thumbnail images did not depict child pornography, on June 23, 2015, before Stewart's first trial, Judge Walker held a separate hearing pursuant to Federal Rule of Evidence 412(b) to determine the admissibility of the images at issue. Doc. 103. During the hearing, Judge Walker described the images on the record.

He described the first image as a woman holding a penis but said there was nothing "that can identify the age, nature or anything special about the penis." *Id.* at 39-40. Judge Walker asked the parties if they saw "anything in that picture that would suggest that penis belongs to any particular person of size or and – quite frankly, I can't even necessarily tell race based on the –." *Id.* at 40. The government

responded by indicating that the photo was significant because it was taken in Stewart's bedroom. *Id.*

The next image also was an image from Stewart's bedroom, identifiable because of the furniture. Doc. 103 at 41-42. Judge Walker asked, "[I]s there anything sexual in that – I see like hair being flipped around." *Id.* at 42. The government conceded that the photo was blurry but stated its position that the photo showed Stewart's penis.

After viewing the third image, Judge Walker asked, "[W]hat am I supposed to be looking at?" Doc. 103 at 42. The government described the location of Stewart's belly, the penis, the victim and her mouth, and the top she was wearing. *Id.* at 42-43. The enlarged view of the image on the court's audio-visual equipment was distorted, so Judge Walker looked at the images from a different computer. After doing so, Judge Walker acknowledged that it was "clear that there is a penis being gripped at the base, and that the person's mouth is being held. And there appears to be, not on the belly, but the head of the individual who is reclined." *Id.* at 43-44. He nonetheless stated that even on the smaller screen, the picture was blurry. *Id.* at 44.

With respect to the fourth picture, Judge Walker noted that it "shows the front right-hand side of C.T.'s face. She's wearing a shirt in this. And the shaft of the penis is in the lower-right-hand corner." Doc. 103 at 44. Judge Walker asked whether there was "anything about that picture that would suggest the age or the identity of the

person to whom the sexual organ belongs," and the government admitted there was not. *Id.*

The fifth picture showed "C.T. . . . not wearing a shirt. It show[ed] the full front of her face, primarily her forehead and her eyes looking down. And it show[ed] basically from the belly button down, her gripping a penis, and you can see the edge of someone's belly." Doc. 103 at 44.

Judge Walker stated that the sixth picture was the least blurry of the pictures and it most clearly showed the belly area. *Id.* He noted:

> You can even see the changing of the color of a suntan line, where somebody would have been wearing briefs. But it shows C.T. performing oral sex on someone and you can see the lower part of their belly. The person doesn't appear to be obese or anything; there's not a huge beer gut, but the person – you can see hair about the belly.

*Id.* at 44-45. Based on the appearance of the individual in picture six, the government argued that the images could not have been C.T.'s boyfriend. *Id.* at 45.

The fact that the images were blurry, which neither party disputed, was a matter for counsel to argue and the jury to assess. C.T.'s testimony that the images depicted her performing oral sex on Stewart supported the jury's factual finding that the images, although blurry, met the definition of child pornography. *See* 18 U.S.C. § 2256(8)(A). Furthermore, because the images depicted oral-genital sexual intercourse, no separate finding of lascivious exhibition under the *Dost* factors was

required. This was not a meritorious appellate issue, and Truskoski was not constitutionally ineffective for failing to raise it.[18]

Stewart has not shown that any of the above claims were "plainly stronger" than those presented by Truskoski to the Court of Appeals. *Davila*, 137 S. Ct. at 2067. As such, Stewart has not shown that appellate counsel's performance was constitutionally ineffective and, therefore, Stewart is not entitled to relief on this ground. *Brown*, 720 F.3d at 1335; *Philmore*, 575 F.3d at 1264; *Payne*, 566 F.3d at 1277; *Miller*, 858 F.2d at 1538.

## C.    Ground Three—Illegal Sentence

Stewart maintains that the sentence Judge Walker imposed violated Stewart's Eighth-Amendment right to be free from cruel and unusual punishment because, according to Stewart, the lifetime term of supervised release is continued punishment in excess of the statutorily permitted incarceration. Doc. 194 at 6, 50-51.[19]

---

[18] Tucked at the end of his argument as to his last claim, Stewart asserts Truskoski was ineffective for not raising on appeal as new evidence an affidavit C.T. submitted to the state court. Doc. 194 at 35. He claims C.T.'s mother was facing state child-abuse charges as a result of C.T.'s testimony, and an affidavit that C.T. allegedly signed in conjunction with those proceedings stated that C.T. had been "coerced and pressured by Edwards and DCF to make statements against her mother during the federal hearing." *Id.* The relevance of such statements to the case against Stewart is unclear, and counsel was not constitutionally ineffective for not raising it.

[19] It is worth noting that the maximum sentence on each of the three counts of conviction was 360 months of imprisonment, resulting in a potential sentence of 1,080 months. But because Judge Walker ordered Stewart's sentence on Counts One

Generally, a defendant "must advance an available challenge to a criminal conviction or sentence on a direct appeal or else the defendant is barred from presenting the claim in a § 2255 proceeding." *Lynn*, 365 F.3d at 1234; *Bousley*, 523 U.S. at 621. A defendant may overcome this procedural default in a section 2255 motion in only one of two situations: the movant "can either (1) show cause to excuse the default <u>and</u> actual prejudice from the claimed error, or (2) show that he is actually innocent of the" conviction. *Granda*, 990 F.3d at 1286.

Because Stewart's claim regarding the allegedly unconstitutional term of supervised release was neither preserved at sentencing nor raised on appeal, it is procedurally defaulted. *Bousley*, 523 U.S. at 621; *Granda*, 990 F.3d at 1286; *Lynn*, 365 F.3d at 1234. Additionally, Stewart cannot overcome this procedural bar. He has not alleged cause to excuse his failure to raise this claim on direct appeal or demonstrated prejudice as a result of the error. He also has not shown that he is actually innocent of the crimes of which he was convicted. *Granda*, 990 F.3d at 1286.

Even if the District Court did address Stewart's illegal-sentence claim, however, it is meritless for at least four reasons. First, a court may include as part of its sentence a requirement that the defendant serve a term of supervised release after

---

and Two to run concurrently, and the sentence on Count Three to run consecutively, Stewart's total sentence was only 720 months of imprisonment.

imprisonment, and because Stewart was convicted of a violation of 18 U.S.C. § 2251, he was statutorily eligible for up to a lifetime term of supervised release. 18 U.S.C. § 3583(a), (k). Second, the guidelines recommend that a lifetime term of supervised release be imposed for sex offenses. U.S.S.G. § 5D1.2(b), p.s. Third, Judge Walker's decision was not made in a vacuum. At sentencing, he stated he had considered the guidelines and other section 3553 factors and explained in detail the evidence supporting the sentence imposed. Doc. 156 at 66-72.

Finally, although Stewart could have challenged the purported illegality of his sentence on appeal, the Eleventh Circuit has repeatedly rejected Eighth-Amendment challenges to the imposition of lifetime terms of supervised release. *See United States v. Carpenter*, 280 F. App'x 866, 867-68 (11th Cir. 2008) (upholding lifetime term of supervised release for sex trafficking a minor or enticing a minor into prostitution); *United States v. Moriarty*, 429 F.3d 1012, 1023-24 (11th Cir. 2005) (upholding lifetime term of supervised release in case involving child pornography). Thus, in addition to raising an argument that is procedurally defaulted, Stewart's illegal-sentence argument also is meritless.

**D.    Ground Four—Denial of a Fair Trial ("DFT")**

In his DFT claim, Stewart asserts that he was denied a fair trial because the government suppressed and withheld material evidence and used knowingly perjured testimony. Doc. 194 at 8, 51-60. He raises five arguments in support of his DFT claim. But because Stewart did not raise these arguments in his direct appeal, absent one of the two exceptions articulated above, Stewart's DFT claim is procedurally defaulted. *Bousley*, 523 U.S. at 621; *Granda*, 990 F.3d at 1286; *Lynn*, 365 F.3d at 1234. In his second amended section 2255 motion, Stewart does not allege cause to excuse his failure to raise this claim on direct appeal or show prejudice as a result of the error. Stewart also has not shown that he is actually innocent of the crimes of which he was convicted. Stewart's DFT claim, therefore, is procedurally defaulted. *Bousley*, 523 U.S. at 621; *Granda*, 990 F.3d at 1286; *McKay v. United States*, 657 F.3d 1190, 1195 (11th Cir. 2011); *Lynn*, 365 F.3d at 1234.

Even if Stewart's DFT claim was not procedurally defaulted, Stewart has not shown, as set forth below, that any of the alleged errors raised in support of his DFT claim are cognizable under section 2255. *Lynn*, 365 F.3d at 1233 (noting that relief under section 2255 "is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice") (quoting

*Richards v. United States*, 837 F.2d 965, 966 (11th Cir. 1988)). That is, Stewart has not shown a due-process violation that resulted in the denial of a fair trial.

### 1.    *Withholding Evidence*

First, Stewart contends that the government withheld or suppressed key evidence as was detailed in his IAAC claim above. Doc. 194 at 8, 51-53. Specifically, he references the government not returning Snipes's forensic report, its failure to allow Snipes to access the physical device, and its failure to produce Draper's triage report from the FDLE. *Id.* He claims that these actions, taken together, constituted a due-process violation that should have resulted in a mistrial.

As noted above, the government did not violate *Brady* with respect to these items. Stewart's assertions with respect to the report and phone are speculative. Additionally, Stewart makes only a passing reference to the triage report and did not explain why he believes this form was *Brady* evidence. *Id.* at 51. Thus, Stewart's speculative assertions about the cell phone and Snipes's report, as well as his passing reference to Draper's triage report, even when considered together, fail to establish a "transgression[] of [a] constitutional right[]" under *Brady* or a "narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn*, 365 F.3d at 1233 (quoting *Richards*, 837 F.2d at 966). This portion of Stewart's DFT claim, therefore, is not cognizable under section 2255.

## 2. *Evidence Handling and Edwards's Contradictory Testimony*

Second, Stewart contends that he was denied a fair trial because the government did not follow proper procedures in handing his cell phone and Investigator Edwards's testimony during Stewart's second trial contradicted her previous statements about how the evidence was stored or handled. Doc. 194 at 8, 53-55.

As noted above, chain-of-custody issues go to the weight, not the admissibility, of evidence. *United States v. Hughes*, 840 F.3d 1368, 1383 (11th Cir. 2016); *United States v. Roberson*, 897 F.2d 1092, 1096 (11th Cir. 1990); *United States v. Lopez*, 758 F.2d 1517, 1521 (11th Cir. 1985). Additionally, as is relevant here, evidence is admissible so long as it is in substantially the same condition as when the crime was committed. *Dewitt*, 943 F.3d at 1098; *Garcia*, 718 F.2d at 1533-34.

During Stewart's second trial, Investigator Edwards testified that she put Stewart's cell phone into a paint can to prevent anyone from remotely erasing data stored on the cell phone. Doc. 165-2 at 119-20. Stewart claims that this testimony was a lie because Edwards never mentioned a paint can at either the first trial or the suppression hearing, and when she attempted to put the phone in the paint can during trial it did not fit. *Id.* at 161. Investigator Edwards also testified that she kept the phone in her office until it was turned over to DHS. *Id.* at 167. She acknowledged

that although the best policy is to give custody of evidence to an evidence custodian, this is not the JCSO's policy. *Id.*

As discussed above, Judge Walker correctly determined that any irregularities in the handling of Stewart's cell phone concerned the weight, not the admissibility, of the evidence. *See Hughes*, 840 F.3d at 1383; *Lopez*, 758 F.2d at 1521. Additionally, although inconsistencies in a witness's testimony generally do not make a trial unfair, any inconsistencies in Edwards's testimony were matters for cross-examination and argument, and the jury was free to give Edwards's testimony the weight it believed her testimony deserved. *See United States v. Abel*, 469 U.S. 45, 51 (1984) (noting that the trier of fact determines the weight it elects to give a witness's testimony).

In light of the above evidence, Stewart has failed to establish a due-process violation or a "narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn*, 365 F.3d at 1233 (quoting *Richards*, 837 F.2d at 966). The second portion of Stewart's DFT claim, therefore, is not cognizable under section 2255.

### 3.    *Cell Phone Triage Report*

Third, Stewart argues that the triage report that Draper testified to preparing when he conducted his logical download of Stewart's cell phone would have been helpful to Stewart's defense. Doc. 194 at 55-56. According to Stewart, such a report

would have contained information on the phone's condition the day that Draper took custody of it. *Id.* at 56. Stewart argues that the government's failure to produce this report to Stewart's counsel was a *Brady* violation, and alternatively, if Draper testified falsely about having made a report when he did not, it was a *Giglio* violation.

A *Giglio* violation arises when the government fails to correct false testimony that "could in any reasonable likelihood have affected the judgment of the jury." *Giglio*, 405 U.S. at 154. To succeed on a *Giglio* claim, therefore, a defendant must show that "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment." *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1107-08 (11th Cir. 2012) (citation omitted).

As noted above, Stewart has failed to establish that the government's handling of Draper's triage report was a *Brady* violation. *Stein*, 846 F.3d at 1145-46 (quoting *Vallejo*, 297 F.3d at 1164). With respect to Stewart's *Giglio* claim, Draper testified that he received Stewart's cell phone from Edwards on May 15, 2014. Doc. 165-2 at 191-92. He photographed the phone and then completed a triage form documenting his receipt of the phone. The triage form included the identity of the person from whom he had received the cell phone, identifying information about the cell phone,

and the nature of the search he was asked to perform regarding the cell phone. *Id.* at 193. He testified that no password was needed to access the phone, which he otherwise would have noted on his triage form. *Id.* at 200.

Because nothing in the record supports Stewart's conclusory assertion that Draper "made up" the above facts that he recorded on the triage form, Stewart has not shown that the government violated *Giglio* by knowingly using perjured testimony or failing to correct such testimony after learning that it was false. *Trepal*, 684 F.3d 1107-08 (citation omitted). Thus, Stewart has failed to establish a constitutional violation or a "narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn*, 365 F.3d at 1233 (quoting *Richards*, 837 F.2d at 966). The third portion of Stewart's DFT claim, therefore, is not cognizable under section 2255.

### 4. *Edwards's Alleged Perjury*

Fourth, Stewart claims that he was deprived a fair trial because Edwards perjured herself when she testified about obtaining a search warrant and what she saw on the phone the day she seized it. Doc. 194 at 56-57. According to Stewart, the AUSA violated *Giglio* by not correcting this perjury.

In an affidavit-complaint signed by Investigator Edwards on May 18, 2014, she says that she reviewed the contents of Stewart's cell phone after making contact with him on May 14, 2014. Doc. 187-1 at 11. She then states:

> I found evidence that confirmed what C had told me. I found several photos of C.D.T. performing oral sex on [Stewart]. According to the date stamp on [Stewart's] phone the photos of C.D.T. had various dates within 2013, which were consistent with what C.D.T. had told me.

*Id.* Investigator Edwards then related her meeting with C.T. at which time C.T. identified herself and Stewart in the photos.

Investigator Edwards's affidavit-complaint was consistent with her testimony at trial, at which Edwards was subject to cross-examination. She stated that she saw a suspicious photo on the phone of what appeared to be a young female engaged in a sexual act. Doc. 165-2 at 110. After discovering the image, she took the phone to the FDLE crime lab. *Id.* at 112. When working from the download the FDLE created, she found the "peek-a-boo" pictures and additional images of what appeared to be C.T. performing oral sex. *Id.* at 122. She showed C.T. the images and C.T. identified herself and Stewart. *Id.* at 127, 145. In light of this evidence, further investigation and the instant prosecution ensued.

Stewart notes, as his only evidence of an inconsistency in Edwards's testimony, that Edwards's affidavit-complaint states that it was Judy Stewart who contacted DCF. Doc. 187-1 at 10. He claims this is inconsistent with other evidence at trial because Wayne Hayes and his grandson, Hunter Sellers, testified at trial that C.T. had told her boyfriend, Sellers, about the abuse, and Wayne Hayes reported it. Doc. 194 at 57. Stewart claims that the AUSA called these witnesses to mislead the jury from the truth: Judy Stewart's allegations stemmed from a "messy divorce and

custody battle." *Id.* Stewart, however, is mistaken about the inconsistency. Hayes reported the alleged abuse in the fall of 2013, which resulted in "no findings," and Judy Stewart reported it again in 2014. Thus, Edwards's testimony is consistent with her affidavit-complaint.

For the reasons set forth above, even if this *Giglio* claim were not procedurally defaulted, Stewart has not shown that the AUSA violated *Giglio* by knowingly using Edwards's allegedly perjured testimony or failing to correct such testimony after learning that it was false. *Trepal*, 684 F.3d 1107-08 (citation omitted). Stewart, therefore, has failed to establish a constitutional violation or a "narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn*, 365 F.3d at 1233 (quoting *Richards*, 837 F.2d at 966). The fourth portion of Stewart's DFT claim, therefore, is not cognizable under section 2255.

### 5. *C.T.'s Alleged Perjury*

Finally, Stewart claims that he was deprived of a fair trial because the AUSA suborned perjury and C.T. committed perjury while testifying. Doc. 194 at 57-60. Essentially, Stewart alleges that he was denied a fair trial because the AUSA committed prosecutorial misconduct.

Only the knowing use of perjured testimony constitutes a due-process violation. *United States v. Bailey*, 123 F.3d 1381, 1397 (11th Cir. 1997) (quoting

*United States v. Lopez*, 985 F.2d 520, 524 (11th Cir. 1993)). A prosecutor is not imputed with knowledge of the falsity of a witness's testimony merely because it conflicts with other evidence. *See Lopez*, 985 F.2d at 524. Instead to establish prosecutorial misconduct based on the use of false testimony, "a defendant must show the prosecutor knowingly used perjured testimony, or failed to correct what [she] subsequently learned was false testimony, and that the falsehood was material." *United States v. McNair*, 605 F.3d 1152, 1208 (11th Cir. 2010).

In support of his claim that the AUSA suborned perjury from C.T., Stewart refers to a text message that he allegedly sent to C.T., telling her to be home by 9:00 p.m. on a particular night. Doc. 194 at 58. C.T. testified that when Stewart messaged her, she was at her boyfriend's grandparents' house, so they could go to church in the morning. Doc. 165-3 at 65. When she came home, Stewart forced C.T. to perform oral sex. *Id.* at 66. On cross-examination, Stewart's attorney noted that the date of the message—November 11, 2013—was a Monday, rather than a Saturday. *Id.* at 90-93. C.T. insisted that the fact that November 11, 2013, was a Monday, rather than a Sunday, would not change her testimony or her recollection of the events she had described because it was "the truth." *Id.* at 93. Stewart also faults the AUSA for not correcting C.T.'s alleged perjury on the stand, including her testimony about using Stewart's phone, when the abuse began, and whether she told anyone or whom she told. Doc. 194 at 59-60.

Stewart provides no evidence, however, that C.T.'s testimony was perjured. The fact that C.T.'s recollection of the dates or details of certain events appeared inconsistent is not proof that the government suborned perjury. The undersigned also notes that inconsistencies in C.T.'s statements over time could have been a product of Stewart's threats to harm C.T. or her family if she told anyone. Doc. 165-3 at 73. Furthermore, even if C.T.'s testimony was untrue or mistaken as to, for instance, the November 11, 2013 text messages and surrounding events, such testimony was not material to the identity of the individuals in the thumbnails on Stewart's phone. C.T., who was still a minor at the time of the trial, was subject to cross-examination about the events in question. The fact that her testimony was prejudicial did not violate Stewart's right to a fair trial.

Because Stewart has not shown that the AUSA knowingly used C.T.'s allegedly perjured testimony, or that any falsehood in C.T.'s testimony was material, Stewart has not shown a due-process violation or prosecutorial misconduct. *McNair*, 605 F.3d at 1208. Stewart also has not shown a "narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn*, 365 F.3d at 1233 (quoting *Richards*, 837 F.2d at 966). This portion of Stewart's DFT claim, therefore, is not cognizable under section 2255.

Stewart also includes two conclusory allegations under this claim. First, Stewart alleges that the AUSA told C.T. to wear her mother's earrings during her testimony "to influence the jury and bolster [its] case" because the individual in the charged images wore the same earrings. Doc. 194 at 58; *see also* Doc. 165-3 at 81. Stewart also alleges that the AUSA told C.T. to dye her hair blond and "tie it up," which was the hair color and style of the individual depicted in the thumbnail images. Doc. 194 at 59. Stewart claims he told trial counsel that the earrings belonged to Judy, not C.T.; that C.T. had never dyed her hair blond; and that she never wore her hair up until she showed up at trial. Stewart asserts that Downing should have challenged C.T.'s change of appearance and jewelry because the images were "nothing more than personal porn of Stewart and his wife." *Id.* Stewart's statement, however, contradicts Stewart's own sworn testimony at trial, when he adamantly denied that he was one of the individuals in the images. Doc. 165-4 at 147-48.

Second, Stewart concludes by asserting he is factually innocent of the crimes of which he has been convicted. Doc. 194 at 60. To the extent he claims that his alleged innocence is sufficient to defeat the procedural bar, Stewart offers no evidence in support of this argument. *Bousley*, 523 U.S. at 621; *Granda*, 990 F.3d at 1286; *McKay v. United States*, 657 F.3d 1190, 1195 (11th Cir. 2011); *Lynn*, 365 F.3d at 1234.

In short, Stewart raised five arguments in support of his DFT claim. Doc. 194 at 8, 51-60. Because Stewart did not raise these arguments in his direct appeal and no exception applies, all arguments in support of Stewart's DFT claim are procedurally defaulted. *Bousley*, 523 U.S. at 621; *Granda*, 990 F.3d at 1286; *McKay v. United States*, 657 F.3d 1190, 1195 (11th Cir. 2011); *Lynn*, 365 F.3d at 1234. Even if Stewart's DFT claim was not procedurally defaulted, Stewart has not shown, as set forth above, that any arguments supporting his DFT claim are cognizable under section 2255. *Lynn*, 365 F.3d at 1233 (quoting *Richards*, 837 F.2d at 966).

Furthermore, although not stated explicitly in Stewart's second amended section 2255 motion, to the extent that Stewart is arguing that the above-stated arguments, taken together, deprived him of a fair trial, this argument is meritless. "Even where individual judicial errors or prosecutorial misconduct may not be sufficient to warrant reversal alone, we may consider the cumulative effects of errors to determine if the defendant has been denied a fair trial." *United States v. Lopez*, 590 F.3d 1238, 1258 (11th Cir. 2009) (citation omitted). "In addressing a claim of cumulative error, we must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." *Id.* (quoting *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1997)).

Many of the issues raised under Stewart's DFT claim are speculative and conclusory assertions. Stewart provided little to no evidence supporting the alleged

*Brady* and *Giglio* violations. Additionally, the complained-of contradictory testimony was subject to cross-examination and generally is insufficient to deprive a defendant of a fair trial. Viewing Stewart's trial as a whole, these issues did not deprive Stewart of his right to a fair trial. *Lopez*, 590 F.3d at 1258.

### E. Ground Five—Newly Discovered Evidence

Stewart next claims that newly discovered evidence, and trial counsel's failure to file a motion for a new trial based on this evidence, demonstrates that he was denied a fair trial and due process. Doc. 194 at 10. The "evidence" in question, according to Stewart, is that C.T. was placed in foster care following the trial, and she made the "same false allegations" against her foster guardian because the guardian set strict rules for her. *Id.* Stewart offers nothing in support of his assertion. Regardless, evidence that did not exist at the time of trial could not have impacted Stewart's due process rights or his right to a fair trial.

To the extent Stewart claims as part of the instant section 2255 motion that he is entitled to a new trial, such a motion is untimely. Federal Rule of Criminal Procedure 33(b)(1) provides that motions for a new trial based on newly discovered evidence must be filed within three years after the verdict or finding of guilty. Fed. R. Crim. P. 33(b)(1). Stewart was required to file a motion under Rule 33(b)(1) on or before August 21, 2018. Doc. 125. He failed to do so.

Aside from the procedural shortcomings of Stewart's motion, Stewart's "new evidence"—that after Stewart's trial, C.T. allegedly made "the same false allegations" against a foster care provider—would not meet the standard for a new trial and, therefore, he has not shown that trial counsel was constitutionally ineffective for failing to file a motion for a new trial based on this evidence. Motions for a new trial based on newly discovered evidence are "highly disfavored" and should be granted only with "great caution." *United States v. Barton*, 909 F.3d 1323, 1337 (11th Cir. 2018) (quoting *United States v. Campa*, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc)). It is the defendant's burden to demonstrate his entitlement to a new trial. To obtain a new trial based on newly discovered evidence, the defendant must demonstrate: (1) the evidence was discovered following trial; (2) the defendant exercised due diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material to issues before the court; and (5) the evidence is of such a nature that a new trial probably would produce a new result. *Barton*, 909 F.3d at 1337 (quoting *United States v. DiBernardo*, 880 F.2d 1216, 1224 (11th Cir. 1989)).

Stewart's subsequent discovery of mere impeachment evidence is insufficient to warrant a new trial. *United States v. Champion*, 813 F.2d 1154, 1171 (11th Cir. 1987). Furthermore, such "evidence," assuming it even exists, would have no bearing on the material issue before the trier of fact in this case: the identity of the man in the photographs stored on Stewart's cell phone, which the government

argued showed C.T. performing oral sex on Stewart on three different occasions. In her affidavit, trial counsel states that several family members contacted her after the trial to tell her about the bad things that C.T. had been doing and saying, but her recollection was that none of the information was relevant or admissible. Doc. 198-2 at 5. Counsel could not be found constitutionally ineffective either for failing to continue to investigate matters tangentially related to Stewart's case after the conclusion of his trial, or for failing to file a motion for a new trial based on the evidence Stewart contends a "competent attorney" could have uncovered.

In his reply, Stewart also contends that "recently obtained evidence indicates C.T. conspired with her mother to falsely accuse Stewart of sex abuse." Doc. 207 at 4. This "new evidence" is an affidavit-complaint signed by Investigator Edwards dated September 24, 2015, which charges Judy Stewart with child abuse and tampering with a witness. Doc. 207-2 at 10. Stewart focuses on Edwards's statement that a woman who resided in the Stewart home heard Judy Stewart tell C.T. that she, Judy Stewart, knew about the video of Stewart forcing C.T. to perform oral sex and that it was a lie. *Id.*

But at least three portions of the affidavit-complaint indicate that Stewart sexually abused C.T. and video recorded this abuse. First, the affidavit noted that after C.T. told Judy Stewart about Stewart's sexual abuse, Judy Stewart sent C.T. and H.S. to their grandparents' house. *Id.* Judy Stewart allegedly chastised C.T.

because Stewart had told Judy Stewart "how C.T. was and that it was all C.T.'s fault." *Id.* Second, the affidavit includes a statement from C.T.'s aunt who reportedly heard Judy Stewart yelling at C.T. in the yard, telling C.T. that "she was the reason why her marriage ended" and "you know you had sex with him, you're a whore, you wanted him." *Id.* Finally, the affidavit recounts that another witness heard Judy Stewart instruct C.T. not to tell the police about Stewart's abuse, as this would cause problems for Judy Stewart. Doc. 207-2 at 10. The same witness indicated that C.T. wanted to speak with the police alone, but that Judy Stewart would not allow this.

The contents of Edward's affidavit-complaint—beyond entailing multiple layers of hearsay—is largely immaterial. To the extent the information contained therein is relevant to Stewart's case, it generally supports the jury's finding of guilt. In short, Stewart has not demonstrated that any of this "new evidence" entitles him to a new trial.

## V—CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2255 Proceedings provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2255 Cases.

Stewart has not shown that he was denied a constitutional right. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, a certificate of appealability is not warranted.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

## VI—CONCLUSION

Stewart has failed to show that any of the claims raised in his section 2255 petition have merit. He also has not demonstrated the need to conduct discovery or for the undersigned to conduct an evidentiary hearing. The undersigned, therefore, respectfully **RECOMMENDS** that the District Court:

1.    **DENY** Stewart's second amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence, Doc. 194.

2.    **DENY** a certificate of appealability.

At Pensacola, Florida, this 14th day of February, 2022.

/s/ *Michael J. Frank*
**Michael J. Frank**
**United States Magistrate Judge**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days of the date of the report and recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.</u> An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.**